Slip Op. 19-113

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TRENDIUM POOL PRODUCTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Gary S. Katzmann, Judge <br> Court No. 18-00132 |

# **OPINION**

[Plaintiff's motion for judgment on the agency record is granted.]

Dated: August 20, 2019

Arthur K. Purcell and Kristen Smith, Sandler Travis & Rosenberg, P.A., of New York, NY and Washington, DC, argued for plaintiff. With them on the brief were Mark Tallo and Sarah E.Yuskaitis.

Elizabeth A. Speck, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Tara Hogan, Assistant Director. Of counsel was Rachel Bogdan, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Katzmann, Judge: This case calls for diving into the deep end of proper scope interpretation. Plaintiff Trendium Pool Products, Inc. ("Trendium") imports finished pool kits and pool walls (collectively "pool products") from Canada to the United States that are ready to construct into above ground pools with no further modification by customers. Trendium requested a scope inquiry clarifying that its pool products, partially made from corrosion resistant steel ("CORES") from Italy and the People's Republic of China ("China"), did not fall within the antidumping duty order for CORES from subject countries, including Italy and China. After

reviewing Trendium's request, the United States Department of Commerce ("Commerce") determined that Trendium's pool products were mixed-media items -- products that are merely combinations of subject and non-subject merchandise -- and no published guidance existed to overcome the presumption that mixed-media items fall within the scope of Commerce's Final Order ("Order"). Thus, Trendium's products were subject to the antidumping duty. Trendium now challenges the scope ruling of Commerce, arguing that the plain language of the Order does not cover downstream products[1] like their pool products. As discussed below, the court grants Trendium's motion for judgment on the agency record and holds that Commerce's determination that Trendium's finished pool products are within the scope of the Order on CORES from subject countries is unsupported by substantial evidence and not in accordance with law. The court remands to Commerce for further explanation or reconsideration consistent with this opinion.

**BACKGROUND**

### I. *Legal and Regulatory Framework of Scope Determinations Generally*

"When participants in a domestic industry believe that competing foreign goods are being sold in the United States at less than their fair value, they may petition Commerce to impose antidumping duties on importers." Mid Continent Nail Corp. v. United States, 725 F.3d 1295, 1297–98 (Fed Cir. 2013) (citing 19 U.S.C. § 1673a(b)). If Commerce determines that "the subject merchandise is being, or is likely to be sold in the United States at less than its fair value," and the United States International Trade Commission ("ITC") determines that a domestic industry is injured as a result, Commerce issues an antidumping duty order. See 19 U.S.C. § 1673d(a), (b).

---

[1] The Merriam-Webster dictionary defines "downstream" as "in or toward the latter stages of a usually industrial process or the stages (such as marketing) after manufacture." Downstream, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/downstream (last visited Aug. 16, 2019); see also Dillinger France S.A. v. United States, 42 CIT __, __, 350 F. Supp. 3d 1349, 1357 n.3 (2018).

Once the order is issued, importers may ask for scope rulings, seeking to clarify the scope of the order as it relates to their particular product. See generally 19 C.F.R. § 351.225.

Commerce often must determine whether a product is included within the scope of an antidumping or countervailing duty order because it necessarily writes scope language in general terms. See 19 C.F.R. § 351.225(a). Commerce's determinations concerning a particular product are made in accordance with its regulations. See 19 C.F.R. § 351.225. Although "Commerce is entitled to substantial deference with regard to its interpretation of its own antidumping duty orders," King Supply Co. v. United States, 674 F.3d 1343, 1348 (Fed Cir. 2012) (citing Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1382 (Fed Cir. 2005)), "the question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law" that the court reviews de novo. Meridian Prods., LLC v. United States, 851 F.3d 1375, 1382 (Fed Cir. 2017) (citing Alleghany Bradford Corp. v. United States, 28 CIT __, __, 342 F. Supp. 2d 1172, 1183 (2004)). "The question of whether a product meets the unambiguous scope terms presents a question of fact reviewed for substantial evidence." Novosteel SA v. United States, 284 F.3d 1261, 1269 (Fed Cir. 2002)).

The framework for evaluating the application of the scope of an order is set forth in Commerce's regulations. 19 C.F.R. § 351.225(k) provides:

> In considering whether a particular product is included within the scope of an order or a suspended investigation, the Secretary will take into account the following:
>
> 1. The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.
>
> 2. When the above criteria are not dispositive, the Secretary will further consider:
>    i. The physical characteristics of the product;
>    ii. The expectations of the ultimate purchasers;
>    iii. The ultimate use of the product;
>    iv. The channels of trade in which the product is sold; and

        v.      The manner in which the product is advertised and displayed

The Federal Circuit has elaborated on the test set forth in 19 C.F.R. § 351.225(k) by establishing that Commerce should engage in a three-step analysis to determine whether merchandise falls within the scope of an order, providing:

> First, Commerce must look to the text of an order's scope; second, Commerce will consult descriptions of the merchandise in other sources; and third, if still necessary, Commerce may consider additional factors comparing the merchandise in question to the merchandise subject to the order. Commerce's inquiry must begin with the order's scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation . . . . If the scope is unambiguous, it governs.

Meridian, 961 F.3d at 1381.

For the plain meaning in a scope determination to be dispositive, it must be "supported by substantial evidence." See 19 U.S.C. 1516(a)(1)(B)(i). The Federal Circuit has held that such a review "requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." Falko-Gunter Falkner v. Inglis, 448 F.3d 1357, 1363 (Fed Cir. 2006). Even when merchandise is facially covered by the literal language of the order, it may still be outside the scope "if the order can reasonably be interpreted so as to exclude it." Mid Continent, 725 F.3d at 1301.

## II.    *Factual and Procedural History of the CORES Order*

United States Steel Corporation, Nucor Corporation, Steel Dynamics Inc., California Steel Industries, ArcelorMittal USA LLC, and AK Steel Corporation ("Petitioners") filed antidumping and countervailing duty petitions on June 3, 2015 with Commerce and the ITC, requesting the initiation of investigations with respect to imports of certain CORES products from China, the Republic of Korea, India, Italy, and Taiwan ("Petition"). See Certain Corrosion-Resistant Steel Products from China, India, Italy, Korea, and Taiwan: Determinations, 81 Fed. Reg. 47,177 (July 20, 2016) ("ITC Investigation"). On June 30, 2015, Commerce initiated the antidumping and

countervailing duty investigations on CORES products from these areas, and on June 2, 2016, Commerce published determinations. Id. On July 15, 2016, the ITC issued a notice of its affirmative finding that the domestic steel industry in the United States is materially injured by reason of imports of certain CORES products from China, India, Italy, Korea, and Taiwan. Id. On July 25, 2016, Commerce issued antidumping and countervailing duty orders on these products. Order, 81 Fed. Reg. at 48,391, 48,389, App. I. The scope of the Order covers, in pertinent part:

> [C]ertain flat-rolled steel products, either clad, plated, or coated with corrosion resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished, laminated, or coated with plastics or other non-metallic substances in addition to the metallic coating . . . coils that have a width of 12.7 mm or greater, regardless of form of coil . . .; products not in coils (*e.g.*, in straight lengths) of a thickness less than 4.75 mm and a width of 12.7 mm or greater and that measures at least 10 times the thickness . . .; products not in coils (*e.g.*, in straight lengths) of 4.75 mm or more and a width exceeding 150 mm and measuring at least twice the thickness . . .; products . . . may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieved subsequent to the rolling process. . . . For purposes of the width and thickness requirements referenced above:
>
> > (1) where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above; and
> >
> > (2) where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain non-rectangular shape, etc.), the measurement at its greatest width or thickness applies.
>
> \*\*\*
>
> For example, specifically included in this scope are vacuum degassed, fully stabilized (commonly referred to as interstitial-free ("IF")) steels and high strength low alloy ("HSLA") steels. IF steels are recognized as low carbon steels with micro-alloying levels of elements such as titanium and/or niobium added to stabilize carbon and nitrogen elements. HSLA steels are recognized as steels with micro-alloying levels of elements such as chromium, copper, niobium, titanium, vanadium, and molybdenum. Furthermore, this scope also includes Advanced High

Strength Steels ("AHSS") and Ultra High Strength Steels ("UHSS"), both of which are considered high tensile strength and high elongation steels. Subject merchandise also includes corrosion-resistant steel that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching and/ or slitting or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in the country of manufacture of the in-scope corrosion resistant steel. All products that meet the written physical description, and in which the chemistry quantities do not exceed any one of the noted element levels listed above, are within the scope of these Orders unless specifically excluded.

See Order, 81 Fed. Reg. at 48,389, 48,391, App. I.

### III. Factual and Procedural History of This Case

The products under consideration in Trendium's scope ruling request are finished pool products made of steel and non-steel components. See Letter from Trendium to the Department, Re: Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of China, Korea, and Taiwan, Scope Ruling Request for Finished Pool Kits and Pool Walls (Nov. 28, 2017) ("Trendium's Initial Scope Request") P.R. 1 at 5. The pool walls include CORES from Italy and China. Id. While subject CORES from China and Italy is used to produce part of the pool products, the steel undergoes further processing and manufacturing in Canada. Id.

To produce the merchandise at issue, Trendium paints the imported galvanized coil from Italy and China as a first step. Id. at 8. The coil are then stamped or flattened as part of a roll-form process into individual pieces, shaped to fit the appropriate size needed for the specific pool component, cut, finished, and hemmed into the pool wall. Id. The process begins with the creation of a hem on the top and the bottom of the wall using a roll form technique. Id. at 7. After hemming, the wall is corrugated, and a notch is cut at both ends of the wall to account for the added thickness due to hemming. Id. The end of the wall is folded and then folded again to increase stability and support when the walls are joined together. Id. Each end of the wall is punched with 36 holes to attach the steel reinforcing bars when assembling the pool. Id. After incorporation of the steel

product into the pool walls, pool kits are ready to be shipped to respective customers.  Id.  When shipped, Trendium's products require no additional manufacturing by the consumer and no additional pieces.  Id.  This processing renders the CORES components unusable for any other purpose.

On November 28, 2017, Trendium filed a scope ruling request with Commerce to determine whether its finished pool products were subject to the Order.  See Trendium's Initial Scope Request.  Commerce found the information in Trendium's initial scope request insufficient to make a determination and issued a supplemental questionnaire.  See Letter from Mark Hoadley to Trendium Pool Products, Inc., Re: Scope Ruling Request: Supplemental Questionnaire) (Dec. 15, 2017) ("Supplemental Questionnaire").  On February 9, 2018, Trendium filed a supplemental scope ruling request with Commerce to determine whether finished pool products were subject to the Order.  See Response to Secretary of Commerce Pertaining to Trendium Pool Supplemental Questionnaire Response (Feb. 9, 2018) P.R. 7.  On May 10, 2018, Commerce issued a scope ruling to Trendium stating that its finished pools kits and individual pool walls fell within the scope of the Order.  See Memo from Commerce, Re: Transfer of Scope Ruling Request (May 10, 2018) ("Final Scope Ruling") P.R. 15.  Commerce reasoned that its practice for evaluating products in which potentially subject merchandise is included in a larger product is governed by the Federal Circuit's decision in Mid Continent and that the inclusion of CORES in Trendium's pools did not bring the CORES outside the scope of the Order.  See Final Scope Ruling.

Trendium filed a complaint against the United States ("the Government") challenging Commerce's Final Scope Ruling on July 16, 2018, ECF No. 17, and amended its complaint on July 26, 2018, ECF No. 20.  Trendium filed its motion for judgment on the agency record on January 7, 2019.  Pl.'s Mot. for J. on the Agency R., ECF No. 37 ("Pl.'s Br.").  The Government

filed its response brief on April 8, 2019.  Def.'s Resp. Br., Apr. 8, 2019, ECF No. 41 ("Def.'s Br."). Trendium filed a reply brief on April 22, 2019.  ECF No. 43 ("Pl.'s Reply").  Oral argument was held on July 9, 2019.  ECF No. 49.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).  The standard of review in this action is set forth in 19 U.S.C. § 1516(a)(1)(B)(i): "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."

## DISCUSSION

Trendium argues that (1) Commerce's Final Scope Ruling failed to consider the plain language of the Order, as Trendium's pool products fall outside the scope of the Order; (2) Commerce unlawfully expanded the scope of the Order to include merchandise not considered during the underlying injury determination; (3) its product is not a mixed-media item subject to the Mid Continent analysis; and (4) the Order does not cover merchandise that has been substantially transformed into a new product, like its pool products.  See generally Pl.'s Br.  The Government counters that Trendium's product is a mixed-media item subject to the two-step analysis in Mid Continent, and Trendium cannot overcome the presumption that mixed-media items are included within the scope of the orders absent explicit language to the contrary.  See generally Def.'s Br.  For the reasons stated below, the court finds that Commerce's determination that Trendium's products are covered by the Order is unsupported by substantial evidence and is not in accordance with law.

### I. Trendium's Pool Products Do Not Fit Within the Plain Language of the Scope of the Order.

#### A. The Scope of the Order Does Not Cover Downstream Products.

Trendium argues Commerce's Final Scope Ruling failed to consider the plain language of the Order in applying the antidumping duty for CORES from China and Italy to its finished pool products because the pool products were neither specifically included nor reasonably interpreted to be included under the Order, as required by Duferco Steel, Inc. v. United States. 296 F.3d 1087, 1089 (Fed. Cir. 2002) ("Scope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it."); Pl.'s Br. at 10. Specifically, the scope of the Order covers CORES from Italy and China, not finished pool products that can no longer be used as a raw input. Furthermore, Commerce's argument that Trendium's product is merely processed within the language of the Order is unavailing. Thus, Commerce's determination was not based upon substantial evidence or otherwise in accordance with law.

Trendium relies on A.L. Patterson, Inc. v. United States, 585 Fed. Appx. 779 (Fed. Cir. 2014) to argue that fully finished downstream products, like its pools and pool walls, were never intended to be included by the Petitioners as part of the scope of the investigation. Pl.'s Br. at 16. While Patterson is an unpublished opinion and thus nonprecedential, the court may look to it for guidance or persuasive reasoning.[2] The court agrees that it is instructive and persuasive.

In Patterson, the Federal Circuit considered whether an order's scope includes merchandise facially covered by the terms of the antidumping order, but which had not been a part of the

---

[2] Federal Circuit Rules of Practice Rule 32.1(d) states "[t]he court may refer to a nonprecedential disposition in an opinion or order and may look to a nonprecedential disposition for guidance or persuasive reasoning, but will not give one of its own nonprecedential dispositions the effect of binding precedent."

underlying investigation. The Patterson court ultimately rejected Commerce's determination that steel coil rods imported from China fell within the scope of an antidumping order on steel threaded rods because coil rods were a distinct product occupying a different domestic industry than the steel threaded rods the ITC investigated. 585 Fed. Appx. at 784–85. Furthermore, Commerce did not offer any evidence to support the conclusion that the imported coil rods fell within the domestic industry the ITC investigated. Id. at 785–86. Instead, evidence showed that Patterson's coil rods were physically distinguishable from the steel threaded rods that were the focus of the original petition, the petition neither mentioned coil rods nor any of the uses of coil rods, no domestic producers of coil rods were included in the description of the domestic threaded rod industry, and there was no evidence that at the time of the petition coil rods were interchangeable with threaded rods or intended to be subject to the duties. Id. at 784-86. In this case, as in Patterson, there is nothing on the record of the original investigation that demonstrates that Petitioners intended to include fully finished downstream products as part of the scope of the investigation. See generally ITC Investigation. While the language of the Order thoroughly details the chemical content of the subject merchandise and intended uses, nowhere does it state that the scope covers downstream products such as cars, appliances or pools. See generally Order. In Patterson, review of the record as a whole included evidence that coil rods were excluded from Commerce's and the ITC's investigations. There, because no evidence showed that when the petition was filed it intended to include or mention coil rods, the record did not support a finding that coil rods were covered by the order. Patterson, 585 Fed Appx. at 784. Similarly here, because the plain language of the Order does not discuss downstream products and the Government can point to no evidence on the record of consideration of downstream products within the Petition filed with Commerce or the ITC investigation, they are reasonably interpreted to be excluded from the scope of the Order.

The Government tries to distinguish <u>Patterson</u> by pointing out that, in this case, the CORES used in Trendium's finished pool products is specifically covered by the <u>Order</u>, whereas in <u>Patterson</u> no part of the coil rods was under the order. Def.'s Br. at 17. The Government contends that because the CORES components fall within the plain language of the scope of the <u>Order</u>, considering other sources in determining the plain meaning of the <u>Order</u> is inconsistent with <u>Mid Continent</u>'s guidance that Commerce should consider the (k)(1) sources as part of the first step of a mixed-media analysis only if it identifies an ambiguity in an order's plain language.[3] <u>Id.</u> Here, as the Government argues, Trendium's pools fall directly within the language of the <u>Order</u>, as Trendium's pool walls undergo exactly the same type of "further processing" that the <u>Order</u> encompasses. Def.'s Br. at 18 (citing the <u>Order</u>, 81 Fed. Reg. at 48,389 ("Subject merchandise also includes corrosion-resistant steel that has been further processed in a third country, including

---

[3] Commerce's reliance on <u>Mid Continent</u> and a mixed-media analysis is misplaced. Before Commerce engages in a mixed-media analysis, it must make a threshold inquiry: whether the item as imported in its assembled condition qualifies as a mixed-media item in the first instance. See <u>Maclean Power, L.L.C. v. United States</u>, 43 CIT __, __, 359 F. Supp. 3d 1367 (2019). Only if this initial inquiry is satisfied does Commerce engage in the mixed-media analysis from <u>Mid Continent</u>. In <u>Walgreen Co. v. United States</u>, the Federal Circuit defines "mixed-media" in the context of scope rulings as a set of products that are "merely a combination of subject and non-subject merchandise, and not a unique product." 620 F.3d 1350 (Fed. Cir. 2010). Furthermore, <u>Mid Continent</u> explains that whether or not an item falls within the scope of an order "depend[s] on whether the mixed-media item is treated as a single, unitary item, or a mere aggregation of items." 725 F.3d at 1298. But <u>Mid Continent</u> considered whether subject merchandise (nails) packaged and imported with non-subject merchandise (assorted household tools) as a part of a mixed-media tool kit was subject to an antidumping order that in its terms covered the nails. In this case, the Government fails to point to anything in the record that shows that Trendium's finished products are mixed-media items consisting of multiple independent items packaged and sold together as a set. By simply jumping into the mixed-media analysis, Commerce failed to explain why Trendium's products should be considered mixed-media items or grapple with the precedent from <u>Walgreen</u> or <u>Maclean</u>. In this case, the record evidence -- including evidence that the end use of Trendium's products are pools in customers' backyards, and not separable raw inputs -- shows that Trendium's pool products are single unitary items, not mixed-media goods. Thus, by failing to consider the record as a whole before applying <u>Mid Continent</u>, Commerce's reliance on <u>Mid Continent</u> in its <u>Final Scope Ruling</u> was unsupported by substantial evidence in the underlying record and not in accordance with law.

but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching and/or slitting or any other processing that would not otherwise remove the merchandise from the scope of the Order")).  However, the key language the court gleans from this part of the Order is "any other processing that would not otherwise remove the merchandise from the scope of the Order."  While certain processing of CORES in a third country would not be sufficient to bring the steel outside the scope of the Order, Trendium's processing, detailed supra pp. 6–7, is so extensive and particular to the product's use as pool walls that the CORES is no longer CORES for the purposes of a scope determination.  Put another way, the amount of processing the CORES components underwent transformed them from a raw input into a finished product, with the only practical use as an above-ground pool.  Just as the steel coil rods were outside the scope of the order in Patterson because they were a distinct product occupying a different market than the steel threaded rods, so too here are Trendium's products distinct from the CORES subject to the Order.

The use of the word "corrugation" in the Order is also instructive.  The beginning of the Order references "certain flat-rolled steel products, either clad, plated, or coated with corrosion resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished, laminated, or coated with plastics or other non-metallic substances in addition to the metallic coating."  Order at 2 (emphasis added).  However, corrugation is notably absent from the list of types of third-country processing that would keep the subject CORES within the Order.  Id. at 4.  ("Subject merchandise also includes corrosion-resistant steel that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, pinching, and/or slitting.") (emphasis added).  Had corrugation been intended to be a part of the third-country further processing techniques listed as within the Order, it could have been stated explicitly.  Instead, the Order incorporated other

processing techniques but excluded corrugation. While the scope of the Order allows for some additional processing of the CORES in a third country, the sum total of the more extensive processing at issue here, which creates a finished product distinct from the original use of the subject CORES, is outside the scope of the Order. Trendium's substantial processing, as detailed supra p. 6, creates a finished product fit only for use in Trendium's pools. Pools are a product that is absent from the plain language of the Order and not considered in the record as within the scope of the Order. As such, the processing is sufficient to bring Trendium's product outside the scope of the Order.

Commerce also fails to address, and the Government does not sufficiently explain, why the pool products were merely processed as opposed to substantially transformed, as Trendium contends. Instead, in its brief the Government simply states that "the further processing Trendium's CORE[S] components undergo is not to such an extent that the CORE[S] becomes physically distinguishable as a separate product or is transformed into a different product, like the steel threaded rod in Patterson." Def.'s Br. at 18. First, as discussed above, the processing that the CORES components undergo here essentially transforms them into a specific pool product. Second, although the Patterson court did consider the differences between Patterson's coil rod product and in-scope merchandise to be relevant, the Federal Circuit primarily relied upon and emphasized how the coil rod product did not overlap in use with in-scope products and how it was a distinct product occupying a different market from the thread rods. Patterson, 585 Fed. Appx. at 784–85. So too here are the pool products a distinct product; due to the processing they undergo, they do not overlap in use with typical CORES products. Thus, the Government's argument that the "processing" Trendium's CORES undergoes keeps it within the scope of the Order is unavailing.

The Government further contends -- as Commerce did in its scope ruling -- that the Petition and ITC Final Determination specifically discussed the use of CORES in many applications, including construction applications similar to Trendium's use. Final Scope Ruling at 9 (CORES is used "in the manufacture of automobile bodies, in appliances, and in commercial and residential buildings and other construction applications"). The Government argues Commerce reasonably determined that the (k)(1) sources indicate that it was contemplated during the investigations that CORES would continue to be subject merchandise if included with larger products like Trendium's finished pool products. Def.'s Br. at 15–16. However, the Government relies on no authority for the proposition that discussing downstream products includes those downstream products within the scope of an order. Indeed, in the Final Scope Ruling, Commerce summarily concluded that, because the Petition and ITC Final Determination discussed the use of CORES in many applications, the Order necessarily included downstream products. Final Scope Ruling.[4] Without more, the passing references to the type of finished products produced from subject CORES cannot be interpreted as proof that the parties contemplated that finished products would be subject to the scope of the Order. Furthermore, accepting such an argument may lead to unintended outcomes. If the court were to adopt Commerce's interpretation of the Order -- that any downstream product

---

[4] Specifically, Commerce asserted that:

> Both the petitions and the ITC report indicate that CORE is used in many applications and is selected by consumers and further manufacturers due to its precise chemical and physical composition, *i.e.*, corrosion-resistance. These characteristics result in a strong and consistent product that resists corrosion better than non-CORE steel alternatives while ultimately extending the life of the consumer product. Thus, these (k)(1) sources indicate that, during the investigations, it was contemplated that CORE would not cease to be subject merchandise if incorporated into larger products.

Final Scope Ruling at 9.

discussed during the underlying ITC investigation in terms of end-usage should be covered by the scope of the Order -- then an array of finished consumer products with CORES inputs would be covered by the Order.

      **B.**    **Commerce Cannot Apply an Antidumping Duty Absent an Injury Determination.**

Commerce's decision was also not in accordance with law because Trendium's products were never considered as part of the ITC's injury analysis despite the requirement of an injury determination prior to the imposition of antidumping duties. See 19 U.S.C. § 1673 (requiring an industry in the United States be "materially injured, or threatened with material injury" prior to the imposition of antidumping duties). Instead, the ITC's injury investigations focused on pricing data for CORES and other raw inputs, not fully finished products like Trendium's pools and pool walls. See Trendium's Initial Scope Request at 9; Id. at Attach. 7 (U.S. Importer Questionnaire); Pl.'s Reply at 11–13. Allowing Commerce to include downstream products would "frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation." Wheatland Tube Co. v. United States, 161 F.3d 1365, 1371 (Fed. Cir. 1998). That the producers of CORES and not domestic producers of above ground pools or other similar downstream products filed the Petition is further evidence that the original injury determination made by Commerce did not encompass Trendium's products. As Trendium highlights, the names and addresses in the investigation of the entities affected by the purported dumping are those who produce the raw input of CORES, not finished products. See Petition at Attach. 1, 2.; Pl.'s Reply at 11–12. Furthermore, the ITC questionnaires for the preliminary phase of the original investigation only collected pricing data for mill sheet products, not downstream items. See ITC Injury Report, P.R. 15 at Attach. 2, IV 9–13. Thus, Commerce's determination that Trendium's product fell within the scope of the Order

is not in accordance with law, as it applies an antidumping duty on a good that lacked a proper injury determination. The Government maintains that the ITC made an injury determination on CORES from Italy and China, and Trendium's product includes this CORES. Thus, they argue, because Trendium's products are subject to the Order, and the ITC injury determination applies to the Order, there was in fact a proper determination of injury to a domestic industry. See Def.'s Br. at 2. However, the Government's argument is unavailing because, as discussed supra, Trendium's products do not fall within the literal terms of the Order. Thus, the injury determination for subject-CORES is not applicable to Trendium's products.

## CONCLUSION

The plain meaning of the unambiguous language of the Order excludes Trendium's finished pool products, as the Order does not cover downstream products. While the Order incorporates CORES that has been "further processed" in a third country, it does not include such further processing that would "otherwise bring it outside the scope of the order." As detailed in the record, the manufacturing process that occurs in Canada, including the corrugation, rolling, and folding, is to such an extent that the CORES loses its identity as a raw input and can only be used for practical purposes as an above ground pool. Additionally, the subject CORES cannot practically be separated from Trendium's products, and the ITC did not evaluate or determine that a domestic industry in the United States would be hurt by the importation of above ground pools or similar downstream products. Because the court finds that Trendium's products are unambiguously outside the scope of the Order, the court need not address the substantial transformation test nor consider the (k)(2) criteria in its analysis. In short, the court finds that Commerce's determination is not supported by substantial evidence and is not in accordance with law. Accordingly, the court remands to Commerce for further proceedings consistent with this

opinion. Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised final determination to the court, and the parties shall have 15 days thereafter to file reply briefs with the court.

    **SO ORDERED.**

                                              */s/ Gary S. Katzmann*
                                              Gary S. Katzmann, Judge

Dated: <u>August 20, 2019</u>
        New York, New York